UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICIA SANTORO, CHET SANTORO | : | NO.:  301CV01724 (AVC) |
| | : | |
| v. | : | |
| | : | |
| BRUCE STORM | : | JUNE 1, 2004 |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56 and D.Conn.L.R. 56, the defendant, BRUCE

STORM, submits that no material facts are in dispute and moves that summary

judgment enter in his favor as to the plaintiffs' entire complaint.  In support of this

Motion, the defendant offers as follows:

1.    The plaintiffs' claim that the defendant chilled their First Amendment rights
      to freedom of speech fails to state a claim upon which relief may be granted;

2.    The plaintiffs' claim that the defendant chilled their First Amendment rights
      does not implicate any clearly-established constitutional rights;

3.    The defendant's actions were objectively reasonable;

4.    The plaintiffs' claim that the defendant chilled their First Amendment rights is
      barred by the doctrine of qualified immunity;

ORAL ARGUMENT IS REQUESTED

5.    The plaintiffs' claims for defamation and defamation per se against the defendant fails to state a claim upon which relief may be granted.

6.    In the alternative, if the Court dismisses the plaintiffs' federal claims, the court should abstain on state law claims.

As required by Local Rule 56 (a)(1), a memorandum of law and statement of material facts, supported by affidavits, exhibits and other admissible evidence is filed herewith.

WHEREFORE, the defendant, BRUCE STORM, prays that his Motion for Summary Judgment is granted.

DEFENDANT,
BRUCE STORM

By____/s/ Melanie A. Dillon_____
    Melanie A. Dillon
    ct24786
    Howd & Ludorf
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    (860) 249-7665 (Fax)
    E-Mail:  mdillon@hl-law.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 1st day of June, 2004.

Katrina Engstrom, Esquire
Norman A. Pattis, Esquire
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

_____/s/ Melanie A. Dillon_____
Melanie A. Dillon

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICIA SANTORO and          :        NO.:  301CV01724 (AVC)
CHET SANTORO                  :
                             :
v.                            :
                             :
BRUCE STORM                   :        JUNE 1, 2004

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 (c) and D. Conn. L. R. 7 (a) 1, the defendant, Bruce Storm, hereby submits the following Memorandum of Law in support of his Motion for Summary Judgment dated June 1, 2004.

The defendant has filed a D. Conn. L. R. 56 (a) (1) Statement of Material Facts Not In Dispute, along with exhibits and affidavits, and relies on the same for the basis of his Motion for Summary Judgment.

## I.    STATEMENT OF FACTS

On August 17, 2001, Patricia and Chet Santoro filed a three-count complaint against the defendant, Bruce Storm, in his individual capacity. The plaintiffs allege that at all relevant times, the defendant was and remains the superintendent of Branford Public Schools.  (Complaint, Counts One – Three, ¶2).  The plaintiffs allege that their son is a varsity athlete at Branford High School and that they became concerned during the 2000-2001 school year that the coaches at the high school were uncertified and, therefore, putting their child at risk of injury and the Town of Branford at risk of liability for injuries.  (Complaint, ¶¶ 4-5).  The plaintiffs allege that they researched their

concerns by writing to the State Department of Education and the American Red Cross. (Complaint, ¶6).

The plaintiffs allege that they presented their findings to the Branford Board of Education on February 28, 2001, and asked what steps would be taken to assure compliance with the laws of the State of Connecticut. (Complaint, ¶ 7). The plaintiffs also allege that they presented the following information to the Branford Board of Education: (1) the high school's athletic director lacked minimum education requirements mandated by law; (2) the high school's athletic department was inadequately supervised by persons lacking the educational requirements mandated by law; (3) the high school's football coach was not certified by state regulators; (4) many coaches lacked required training in first aid and cardiopulmonary resuscitation; and (5) many coaches lacked the minimum state certification to coach students. (Complaint, ¶8).

## A.    PLAINTIFF'S COMPLAINT

The plaintiffs allege defamation *per se* and defamation against Dr. Storm for comments he made to a local newspaper reporter regarding certain documents produced by the plaintiffs at a February 28, 2001, Branford Board of Education meeting and for publishing a memorandum to the school board on March 21, 2001, wherein Dr. Storm stated that the plaintiffs had submitted "fake and potentially fraudulent" documents to the board at the February 28, 2001 meeting. (Complaint, Counts One & Three, ¶¶ 10-11). The plaintiffs also claim that the defendant's March 21, 2001 memorandum alleges moral turpitude on the part of the plaintiffs. (Complaint, Counts One & Three, ¶ 12).

2

Count Two alleges that the defendant chilled the plaintiffs' in the exercise of their First Amendment rights because he uttered and wrote malicious falsehoods about the plaintiffs. (Complaint, Count Two, ¶17). As a result of the defendant's alleged conduct, the plaintiffs claim that they will not dare to criticize town officials again. (Complaint, Count Two, ¶ 21).

## B.    UNDERLINE UNDISPUTED FACTS

In July 1999, the State of Connecticut Department of Education adjusted the regulations regarding the coaching credentialing process, which included the issuance of five-year renewable coaching permits. (Exhibits A, B & M).[1] Pursuant to Conn. State

---

[1] Conn. State Agency Regs. § 10-145d-423 (b) provides in relevant part:
On and after July 1, 1999, a coach (regardless of coaching assignment) of intramural or interscholastic athletics in elementary, middle or high schools, shall meet the requirements of subdivisions (1) through (7), inclusive, of this section:
(1) Hold the following permit: (A) A coaching permit; or (B) A temporary coaching permit.
(2) A person serving as a director of athletics at the elementary or secondary school level, not responsible for supervision, shall be required to hold a coaching permit;
(3) A person serving as a director of athletics at the elementary or secondary school level, responsible for the supervision of coaches, shall be required to hold a coaching permit and a valid Connecticut educator certificate;
(4) A person serving as a director of athletics, with district-wide responsibilities for the athletic program or evaluation of certified staff, shall be required to hold a coaching permit and a Connecticut educator certificate endorsed for intermediate administration or supervision;
(5) An individual who serves as a coach shall hold a coaching permit or a temporary coaching permit. An individual, not serving as any type of coach, may assist a coach, if working under the direct and continual supervision of a coach;
(6) A coaching permit shall be valid from the effective date and shall be renewable every five years upon completion of not less than 15 clock hours of seminars, course work or workshops which provide information on safe and healthful coaching practices and understanding child and adolescent development, as approved by the Department. Upon the written request of an employing agent, the Department, for good cause shown, may defer the 15 clock hour requirement for 12 months;
(7) To receive a coaching permit, an applicant shall meet the following requirements:
(A) Attain the age of 18 years;
(B) Hold a high school diploma or its equivalent;
(C) Successfully complete a standard first aid course no earlier than three years prior to the date of application and every three years from the date of the course thereafter, and continuously maintain CPR certification; and (D) Complete either (i) or (ii):
(i) Complete a minimum of three semester hours of credit from a regionally accredited institution or 45 clock hours of instruction in a program offered by a board of education or the Connecticut Interscholastic Athletic Conference and approved by the Department

Agency Regs. § 10-145d-423, the following prerequisites must be met before a five year renewable coaching permit will issue:  a coach must (1) be at least 18 years of age, (2) hold a high school diploma or its equivalent, (3) complete a standard First Aid training course three years prior to the application date for the permit and complete a CPR course annually, and (4) hold a valid Connecticut educator's certificate *or* complete 3 hours of instruction at an accredited institution or 45 hours of instruction in a program offered by a board of education or the Connecticut Interscholastic Athletic Conference. Conn. State Agency Regs. § 10-145d-423 (b).

To obtain the five-year renewable coaching permits, each school district was required to submit a list of their coaching staff on a "batch conversion" form along with copies of the CPR/First Aid card for each coach to the State Department of Education. (Exhibits A & B).  Since the school year did not commence until September, the Branford Public Schools Athletic Directors began the process of completing the batch conversion form and obtaining all of the required documentation in September 1999. (Exhibits A).

On October 6, 1999, the batch conversion form was completed and signed by Dr. Storm and forwarded to the State Department of Education.  (Exhibits A & C).  The Branford Athletic Directors followed up with the State Department of Education to check on the status of the permits and were informed that the permits would be forwarded to the Branford Public Schools Central Office rather than to each individual coach.  (Exhibit

---

which shall include each of the following topics: legal and safety aspects of coaching children and adolescents; medical aspects of coaching children and adolescents; and principles and practices of coaching children and adolescents and child and adolescent sports psychology; or (ii) Hold a valid Connecticut educator certificate, standard or permanent certificate.

A).  Accordingly, the Branford Athletic Directors assumed that the permits would be forwarded to the Central Office upon completion and retained in their personnel files. (Exhibit A).

In November 2000, one of the Branford Athletic Directors, John "Jake" Paluzzi, cut the plaintiffs' son, Ryan Santoro, from the Branford High School basketball team. (Exhibit D, pp. 35-37).  Shortly thereafter, the plaintiffs were informed by a few individuals that the Branford Athletic Directors, Jake Paluzzi and Savas Synodi, were not certified.  (Exhibit E, pp. 17-18).  The plaintiffs admit that prior to their son being cut from the basketball team they did not have an interest in certification and CPR/first aid training of the Branford Public Schools coaches and that they had never complained about the athletic program or any of the coaches in the Branford Public Schools. (Exhibit D, p. 35; Exhibit E, pp. 16-17).

After learning that the Branford Athletic Directors were allegedly not certified to perform the duties of their positions, Patricia Santoro conducted some research at the library and wrote a letter to the Branford Board of Education requesting documentation substantiating that Jake Paluzzi is a certified teacher.  (Exhibit E, pp. 19-20; Exhibit F). Ms. Santoro also wrote a letter to the State Department of Education requesting information regarding the certification of several of the Branford coaches.  (Exhibit E, pp. 21-22).  Ms. Santoro conceded that in her initial January 22, 2001 letter to Dr. Hilary Freedman, State Department of Education, she only requested information regarding the certification of the Branford football, baseball and basketball coaches.  (Exhibit E, pp. 23-25).  Ms. Santoro did not initially request any information regarding female coaches.  (Exhibit E, pp. 23-25).

Ms. Santoro also wrote a letter to the American Red Cross, South Central Connecticut Chapter, requesting information under the Freedom of Information Act, regarding First Aid and CPR training of some of the Branford Public Schools coaches.

(Exhibit E, p. 26; Exhibit G).[2]  Kevin Finucane delivered Ms. Santoro's letter to American Red Cross, South Central Connecticut Chapter, and returned to pick up the response to the letter.  (Exhibit E, pp. 30-31).  Although Ms. Santoro concedes that CPR/First Aid training could be obtained from other organizations, she did not contact any of these other organizations to obtain information regarding CPR/First Aid training of the Branford coaches.  (Exhibit E, pp. 26-27).

Kevin Finucane took Ms. Santoro's letter to the Red Cross with the written responses to her inquiries in the margins of the letter and created a new document. (Exhibit D, pp. 7, 60-62, 117-118, 122-123; Exhibit E, pp. 30, 42-44; Exhibit H).  Mr. Finucane typed American Red Cross, South Central Connecticut Chapter, along with the contact information, including the address and phone number across the top of the document in large, boldface type.  (Exhibit H).

Prior to presenting the information that they obtained from the American Red Cross and the State Department of Education to the Branford Board of Education, the plaintiffs did not contact the Branford Public Schools administration or the Branford Board of Education.  (Exhibit D, pp. 49-50, 96-97, Exhibit E, pp. 31-32).  On February 28, 2001, Patricia Santoro made a presentation to the Branford Board of Education about the alleged various violations of the state statutes because the Branford Athletic Directors did not have proper qualifications and/or certification.  Ms. Santoro further stated that certain coaches were not certified by the State Department of Education and/or their CPR/First Aid training was not up to date.  (Exhibit E, p. 45; Exhibit I; Exhibit J).  The plaintiffs also presented a packet of information to the Board of Education, including a letter from the State Department of Education, the "American Red Cross" document created by Kevin Finucane, CPR/First Aid training course documentation

---

[2] Although the information was requested under the Freedom of Information Act, the American Red Cross is not an organization under the control or supervision of the Federal Government and, therefore, it "was not intended to be included within the terms of the FOIA."  Irwin v. American Nat. Red Cross, 640 F.2d 1051, 1058 (9th Cir. 1981).

from the American Red Cross and a memo from Rowena Gatta to Jake Paluzzi regarding the batch conversion forms and attachments.  (Exhibit E, pp. 38-40; Exhibits H, K, L & M).

Although the plaintiffs provided the Board of Education with the "American Red Cross" document created by Kevin Finucane at the February 28, 2001 meeting, the plaintiffs failed to inform the Board of Education that this document was not an official American Red Cross document.  (Exhibit D, p. 62; Exhibit E, p. 42; Exhibit J).  The plaintiffs claim that the "American Red Cross" document created by Kevin Finucane was based upon the information Ms. Santoro received from the American Red Cross; however, Ms. Santoro conceded that the document created by Kevin Finucane indicated that certain coaches ***were not certified*** while the letter upon which it was allegedly based actually indicated ***no records were on file for that particular individual***.  (Emphasis added.)  (Exhibit E, pp. 43-44, Exhibit G & H).  Additionally, a few of the names on the "American Red Cross" document do not appear on Ms. Santoro's letter to the American Red Cross. (Exhibit G & H).

Following the plaintiffs' presentation at the meeting on February 28, 2001, Catherine Jackson, the chairperson of the Branford Board of Education, instructed Dr. Bruce Storm to investigate the matter and report his findings to the Board of Education. (Exhibit E, pp. 46-47).  Accordingly, on March 1, 2001, Dr. Storm met with Mark Winzler, Assistant Superintendent for Branford Public School System at that time; Dr. Ed Higgins, Principal of Branford High School; Savas Synodi and Jake Paluzzi and reviewed everything in the athletic directors' files.  (Exhibits A & B).  Savas Synodi produced copies of the batch conversion form containing names of the coaching staff as of September 1999, as well as the attached photocopies of the CPR/first aid cards for all of the coaches.  (Exhibits A, B & C).

Mark Winzler contacted the State Department of Education to begin an extensive investigation into the whereabouts of the October 6, 1999 batch conversion

form.  (Exhibits A & B).   The State Department of Education was unable to locate the
October 6, 1999 batch conversion form.  (Exhibit B).  Accordingly, the batch conversion
form was re-submitted and as of March 21, 2001, each member of the coaching staff for
the Branford Public School system was either certified or finalizing necessary
paperwork with the State Department of Education.  (Exhibits A & B).

In addition to meeting with the Athletic Directors and reviewing the documents
contained in their files, Dr. Storm took the "American Red Cross" document to the
American Red Cross, South Central Connecticut Chapter, and asked Guy Sunny, the
Executive Director, if it was an official document.  (Exhibit A).  Mr. Sunny did not
recognize the letterhead and stated that it was not an official American Red Cross
document.  (Exhibit A).  Dr. Storm also showed another employee of the American Red
Cross photographs of Kevin Finucane and that employee confirmed that Mr. Finucane
had arrived at the New Haven Red Cross on two different occasions requesting
information on behalf of the Branford Board of Education.  (Exhibit A.)

On March 8, 2001, an article regarding the certification of the Branford
coaching staff was published in *The Sound* newspaper.  (Exhibit N).  The article
indicated that Dr. Storm had informed the reporter that the "Red Cross" document that
the Santoros provided to the Board of Education was not an official American Red
Cross document and that the Red Cross could not identify the document. (Exhibit N).
The article further indicates that Dr. Storm stated that *someone* had misrepresented
himself as a Board of Education member to the American Red Cross.  (Exhibit N).

Although the coaches and athletic directors did not appear to have proper
certification according to the records at the State Department of Education, each
member of the Branford coaching staff had up to date CPR and First Aid training.
(Exhibits A & B).  The Branford Public Schools Athletic Directors are certified first aid
and CPR instructors and ensure that the Branford coaching staff is up to date on their
training.  (Exhibits A & B).

8

At the March 21, 2001 Board of Education meeting, Dr. Storm presented his findings to the Board as well as the citizens attending the meeting.  A memorandum regarding those findings and Dr. Storm's comments on the same was distributed at the March 21, 2001 meeting.  (Exhibit P).

On March 26, 2001, Dr. Storm wrote to Dr. Freedman to thank her for her assistance in resolving the dispute associated with certification of the Branford coaches.  (Exhibit Q).  On August 13, 2001, Dr. Storm wrote to Dr. Freedman in response to her August 2, 2001 letter regarding the job duties of the Athletic Directors and the certification required for their positions.  (Exhibits T & U).

On September 12, 2001, Dr. Freedman wrote to Dr. Storm requesting that he provide her with an attestation that the Branford Athletic Directors do not evaluate certified staff.  (Exhibit V).  Dr. Freedman acknowledged that if the Branford Athletic Directors did not evaluate certified staff and if they had served as the Athletic Directors on or before July 31, 1998 that they could remain in their positions.  (Exhibit V).  On September 19, 2001, Dr. Storm sent a letter to Dr. Freedman attesting to the fact that the Branford Athletic Directors, John Paluzzi and Savas Synodi, do not evaluate certified staff.  (Exhibit W).  Dr. Storm further stated that the Branford High School Principals and Assistant Principals evaluate certified staff. (Exhibit W).

Although the situation appeared to be resolved as of September 19, 2001, Patricia Santoro wrote a letter to the Editor of *The Branford Review* accusing the Branford Public Schools Administration of acting improperly with respect to the  issues they raised regarding certification of the Branford coaches.  (Exhibit X).

The plaintiffs claim that Dr. Storm's statements to *The Sound* newspaper reporter that appeared in the March 8, 2001 article, numerous statements in Dr. Storm's March 21, 2001 memorandum, and statements in the March 26 and August 13, 2001 letters to Dr. Hilary Freedman constitute defamation and defamation *per se*.  (See

9

Plaintiffs' Supplemental Reponses to Interrogatories and Requests for production, copy attached as Exhibit Y.)

The defendant, Bruce Storm, now moves for summary judgment with respect to the plaintiffs' entire Complaint.

## II.    <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A "material fact" is one whose resolution will affect the ultimate determination of the case.  <u>Id</u>.  In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  <u>Id</u>. at 255; <u>J.F. Feeser, Inc. v. Servi-A-Portion, Inc.</u>, 909 F.2d 1524, 1531 (3d Cir. 1990), <u>cert. denied</u>, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).  However "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Samuels v. Smith</u>, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256, 106 S.Ct.

1570, 94 L.Ed.2d 763 (1987);  Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d

438, 445 (2d Cir. 1980).  Thus, once the moving party has satisfied its burden of

identifying evidence which demonstrates the absence of a genuine issue of material

fact, the non-moving party is required to go beyond the pleadings by way of affidavits,

depositions, and answers to interrogatories in order to demonstrate specific material

facts which give rise to a genuine issue.  Celotex Corp. V. Catrett, 477 U.S. 317, 324,

106 S.Ct. 2548, 2553, 91 L.Ed. 25 (1986).  "Neither courts nor defendants should be

subjected to trials which can be little more than harassment."  Applegate v. Top

Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).

Where evidence is submitted in support of, or in opposition to, a motion for

summary judgment, such evidence must be presented in a manner consistent with its

admissibility at trial.  *See* First National Bank of Clinton, Ill. v. Insurance Co. of North

America, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the

district court properly relied on documents and exhibits identified by affidavit).  Unsworn

statements of the parties, letters addressed to litigants from third persons, and hearsay

that does not fall under one or more of the exceptions listed in Rules 803-805 of the

Federal Rules of Evidence, may not properly be considered.  *See* Adickes v. S.H. Kress

& Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Beyene v. Coleman

Security Services, Inc., 854 F.2d 1179 (9th Cir. 1988).

## III.    LAW AND ARGUMENT

### A.    PLAINTIFFS' FEDERAL LAW CLAIM PURSUANT TO 42 U.S.C. §§ 1983 AND 1988

The plaintiffs allege that they have been "chilled in the exercise of the right to

freedom of speech in ***that they fear*** they will be further vilified and made targets of

public and untruthful statements should they dare to criticize town officials again."
(Emphasis added.) (Complaint, Count Two, ¶ 19).  The plaintiffs further allege that as a
direct and proximate result of the defendant's comments and written words they
suffered emotional distress and the loss of their constitutional right to freedom of
expression.  (Complaint, Count Two, ¶19).

### 1.    The Plaintiffs Fail To State A Cause Of Action For Chilling Of Their First Amendment Right To Freedom Of Expression

"To state a claim under Section 1983, a plaintiff must allege facts indicating that
some official action has caused the plaintiff to be deprived of his or her constitutional
rights – in other words, there is an injury requirement to state a claim."  Colombo v.
O'Connell, 310 F.3d 115, 117 (2d Cir. 2002).  Furthermore, to sustain a claim for chilling
of the First Amendment right to freedom of expression, the plaintiffs must "show that the
defendant's actions *had some actual, non-speculative chilling effect*."  (Emphasis
added.)  Id.

In Colombo v. O'Connell, the plaintiff sued the Superintendent of Schools for the
Town of Stratford, claiming that he violated her First Amendment right to free speech.
Colombo, 310 F.3d at 116.  The plaintiff alleged that the violation occurred when the
superintendent threatened to sue her for libel after she a filed a petition for a recall vote
of the Town of Stratford Board of Education that alleged illegal and unethical behavior
on the part of the superintendent.  Id.  The District Court granted summary judgment to
the defendant because the plaintiff testified at her deposition that she "still felt free to
speak up about whatever she wanted to say after receiving [the defendant's] letter . . .
and alleged no actual effect on the exercise of her first amendment rights at all."  Id. at
117.

Similarly, in Spear v. Town of West Hartford, a resident of the town of West
Hartford claimed that the Town violated his First Amendment rights when the Town filed

a lawsuit against him following an anti-abortion protest.  Spear, 954 F.2d 63 (2d Cir. 1992).  The plaintiff had written an editorial in the *Orange County Post* shortly after the protest entitled "Northern Rednecks" in which he criticized the efforts of the West Hartford Police to disband the demonstration.  Id.  The District Court "held that [the plaintiff] had failed to state a cause of action under section 1983 for deprivation of First Amendment rights."  Id.

> Relying on Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the District Court explained that a plaintiff must make a specific allegation of fact that indicates a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient.

Id.

In Laird v. Tatum, the plaintiffs alleged "their rights were being invaded by the Department of the army's alleged surveillance of lawful and peaceful civilian political activity."  408 U.S. at 2.  The U.S. Supreme Court ultimately held that the respondents' claim that their First Amendment rights were chilled by the mere existence of a data-gathering system, does not constitute a justiciable controversy because there was no evidence of actual harm or threat of specific of future harm.  Id.

The U.S. Supreme Court reasoned that "allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  Laird v. Tatum, 408 U.S. at 13-14.  The Supreme Court relied on prior cases in reaching this decision.

> In recent years, this Court has found in a number of cases that constitutional violations may arise from the deterrent or chilling effect of governmental regulations that fall short of a direct governmental prohibition against the exercise of First Amendment rights. . . .  In none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with

13

the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual.  Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions or compulsions that he was challenging.

Laird, 408 U.S. at 11.

In the present case, the plaintiffs allege that they cannot exercise their First Amendment rights because "*they **fear** they will be further vilified and made targets of public and untruthful statements should they dare to criticize town officials again.*" (Emphasis added.)  (Complaint, Count Two, ¶ 19).  The plaintiffs' cause of action, therefore, fails on its face because the plaintiffs have not alleged either actual harm or specific threat of future harm.  The plaintiffs' "fear" that they will be further vilified and made targets of public untruthful statements is merely speculative, as they have not attended any Branford Board of Education meetings since February 28, 2001, and they have not alleged that anyone, including the defendant, has prohibited them from attending and/or speaking at Branford Board of Education meetings.

The plaintiffs assert, however, that Dr. Storm has chilled their First Amendment right to freedom of speech because they would never go to the Branford Board of Education and speak on any issue.  (Exhibit D, pp. 193-199; Exhibit E, p. 102-103).  The plaintiffs do not allege, however, that they would have any problem exercising their First Amendment rights in other forums.  Moreover, the undisputed facts demonstrate that Patricia Santoro has exercised her First Amendment right to freedom of speech when she wrote a letter to *The Branford Review*, in which she indicated that the Branford Board of Education and Administration had acted improperly with respect to the issues raised regarding certification of the Branford coaches.  (Exhibit E, pp. 102-103; Exhibit X).  Additionally, Ms. Santoro conceded that she was exercising her First Amendment right to free speech when she wrote to *The Branford Review* on October

14

17, 2001, and that she wouldn't hesitate to go to the press with a problem.  (Exhibit E, pp. 102-103).

Moreover, neither plaintiff could specifically identify how the actions of Dr. Storm had actually chilled their First Amendment right to freedom of speech nor do they allege that they are not allowed to speak at Board of Education meetings.  Chet Santoro claimed that the mere fact that Dr. Storm investigated the plaintiffs' concerns regarding the certification of coaches chilled his right to free speech.  (Exhibit D, p. 96).  Yet, Patricia Santoro explained that Catherine Jackson had instructed Dr. Storm to investigate the matter.  (Exhibit E, pp. 46-47).  Chet Santoro conceded that he could not identify anything else that Dr. Storm did to chill his First Amendment right to freedom of speech at the February 28, 2001 Board of Education meeting. (Exhibit D, pp. 105-107).

The plaintiffs have also failed to produce any evidence that demonstrates that they cannot exercise their First Amendment rights at the Board of Education meetings or in any other public forum.  In fact, Chet Santoro admits that he still has the right to attend and speak at Board of Education meetings.  (Exhibit D, p. 212).  Additionally, there is no way to determine if the plaintiffs' actions have actually changed as a result of Dr. Storm's statements because the plaintiffs admit that Chet Santoro did not attend Board meetings prior to February 28, 2001, and that Patricia Santoro had only attended one Board meeting prior to that time.  The plaintiffs have not attended any Board meetings since February 28, 2001.  (Exhibit D, p. 203; Exhibit E, p. 118).  Furthermore, their fear that "they will be vilified and made the subject of public and untruthful" is merely speculative and is not sufficient evidence to sustain a cause of action for chilling of the plaintiffs' First Amendment rights.

The undisputed facts demonstrate that the defendant's actions did not chill the plaintiffs' First Amendment right to freedom of speech.  Therefore, the plaintiffs' cause of action for chilling of First Amendment rights fails as a matter of law and the defendant is entitled to summary judgment with respect to Count Two of the plaintiffs' complaint.

## 2.    The Doctrine of Qualified Immunity Bars the Plaintiffs' Claim That the Defendant Chilled Their First Amendment Rights

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is more than just a defense; the doctrine of qualified immunity is an immunity from suit. (Emphasis added.) Locurto v. Safir, 264 F.3d 154, 163 (2d Cir. 2001).

A right is "clearly established" when "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [T]he unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). See, e.g. Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly break the law"); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions they took").

Recently, the Supreme Court has re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. Saucier v. Katz, 533 U.S. 194, 202 (2001). For example, there is no doubt that the case of Graham v. Connor, 490 U.S. 386 (1989), clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, the Supreme Court has concluded that observation of that general principle is simply not enough when undertaking a qualified immunity analysis.

In Saucier, the Supreme Court reiterated the need for a careful examination of the particular constitutional right alleged to have been violated when considering the

16

defense of qualified immunity.  533 U.S. at 202.  Not only should the right itself be

identified with a higher degree of specificity, the precise contours of the application of

that more specific right to the facts at hand must be made by the district court reviewing

a defense of qualified immunity.   Id.  The Saucier Court reiterated the admonition from

Anderson that:

> [t]he right the official is alleged to have violated must have been 'clearly
> established' in a more particularized, and hence more relevant, sense:
> The contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.

Saucier, 533 U.S. at 202.

Since the decision in Saucier, the Supreme Court decided Hope v. Pelzer, 536

U.S. 730 (2002), providing additional guidance to litigants and courts examining the

issues within and part of the defense of qualified immunity.  In Hope, the Supreme Court

reversed the Court of Appeals for the Eleventh Circuit, which had affirmed the district

court's grant of summary judgment, based on qualified immunity.

The Supreme Court in Hope rejected the Eleventh Circuit's rule that the test for

the existence of a clearly established right that would allow a public official to

understand the potential wrongfulness of his conduct should be evaluated in light of

federal law that was "pre-existing, obvious and mandatory."  See Hope, 536 U.S. at 734.

In reversing the Court of Appeals, the Supreme Court rejected the gloss placed on the

Saucier analysis for qualified immunity by that Circuit that there must be reported cases

that are "materially similar" before a violation is found.  In so holding, the Supreme Court

adopted the "fair warning" standard found in United States v. Lanier, 520 U.S. 259

(1997) as an additional methodology to evaluate the second prong of the qualified

immunity analysis.  The Supreme Court emphasized the need for the detailed,

searching and thorough analysis each and every time the defense based on the

doctrine of qualified immunity is raised.  The decision in Hope is, in one sense, a

continuation of the Supreme Court's admonition that the most important part of any

17

qualified immunity decision is the examination of the constitutional right at issue and "the precise contours of the application of that more specific right to the facts at hand must be made." Saucier, 533 U.S. 194 at 202. In rejecting the "materially similar" standard espoused by the Eleventh Circuit, the Court has done nothing more than demand a high standard – not in pleading or proof – but in the continued, searching, and thorough, step-by-step examination of the defense of qualified immunity in the manner long-established by clear and unequivocal precedent.

Not long after the decision in Hope, the Second Circuit stated:

> Our analysis of a qualified immunity claim consists of a three step inquiry. . . . . First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. . . . Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendants], he or she must demonstrate that defendants' actions were not objectively reasonable. . . . This three step inquiry should typically be done in sequential order.

(Citations omitted.) Harhay v. Town of Ellington, et al., 323 F.3d 206, 211 (2d Cir. 2003).

This statement of the law succinctly captures just the sort of step-by-step, orderly methodology mandated by twenty years of Supreme Court precedent. Furthermore, this Court recognized that the failure to establish any one step of the analysis grants qualified immunity to the defendant. Harhay, 323 F.3d at 211-2. Therefore, before applying the qualified immunity standard, the Court must ask whether there was a constitutional violation in the first instance. See Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999).

### a.    The Plaintiffs Have Not Alleged a Clearly Established Constitutional Right Under The First Amendment

To determine whether a right was clearly established, a court should consider "the specific context of the case," not whether the right was clearly established "as a broad general proposition." Saucier, 533 U.S. at 201. "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." Id.

"This does not mean that an official action is protected by qualified immunity unless the very action has previously been held unlawful, however, but rather that in light of the pre-existing law the unlawfulness must be apparent." (Internal quotation marks omitted.) Ceballos v. Garcetti, 361 F.3d 1168, 1180 (9th Cir. 2004). *See also* Hope v. Pelzer, 536 U.S. at 739. "The relevant question **is not** whether it was clearly established that [the plaintiffs have] First Amendment rights. ***Rather, the Court must ask whether the state of the law in [2001] gave [the defendant] fair warning that [his] alleged treatment of [the plaintiffs] was unconstitutional*.**" (Emphasis added; internal quotation marks omitted.) Auleta v. LaFrance, 233 F. Supp. 2d 396, 403 (N.D.N.Y. 2002). *See also* Hope v. Pelzer, 536 U.S. at 741.

In the present case, the plaintiffs do not allege that they were actually prohibited from speaking at the Audience of Citizens portion of the Branford Board of Education meeting. In fact, the undisputed facts demonstrate that although the plaintiffs were interrupted during their presentation to the Board on February 28, 2001, they were ultimately allowed to continue with their presentation and voice their opinions with respect to the certification of the Branford coaches. (Exhibit J). The plaintiffs allege, however, that as a result Dr. Storm's comments on March 21, 2001, regarding the plaintiffs' presentation at the February 28, 2001 board meeting they will no longer speak at Board meetings due to their "fear that they will be further vilified and made the subject of public and untruthful statements."

19

Neither the Supreme Court nor the Second Circuit has addressed the particular issues and facts in the present case. Nor is there law that would have put the defendant on notice that he could not make comments with respect to a presentation by citizens at a Board of Education meeting, particularly where those citizens accused Branford Public Schools officials, including the superintendent, the principal of the high school and the Athletic Directors, of creating the problem of which they complained, of lacking the requisite skills to perform their job and of not doing their job.

The law as of March 21, 2001 was not clearly established so as to provide the defendant with fair warning that he could not comment on the validity of the information presented at a previous Board meeting and question the motives of the speakers and the manner in which the information was presented to the Board. Accordingly, the plaintiffs' claim that the defendant's actions chilled their First Amendment right to freedom of speech is barred by the doctrine of qualified immunity.

### b.    The Defendant's Actions Were Objectively Reasonable

The third step of the qualified immunity analysis that the court must undertake is whether the defendant's actions were objectively reasonable. "[I]f plaintiff[s] have a clearly established, constitutionally protected right that was violated by the actions of the [defendant], [the plaintiffs] must demonstrate that defendants' actions were not objectively reasonable." Harhay v. Town of Ellington, et al., 323 F.3d at 211. "Even if the constitutional right was clearly established at the time of the alleged injury, a public official may still be entitled to qualified immunity if he makes an objectively reasonable mistake about what the law requires." Saucier, 533 U.S. at 205.

The particular facts of the present case demonstrate that the defendant's actions were objectively reasonable. At the February 28, 2001 Board meeting, the plaintiffs informed the Board of Education, the members of the public in attendance as well as those individuals watching the broadcast of the meeting via the public access channel,

20

that the Branford Public Schools Athletic Directors were not properly certified by the State Department of Education and that the Branford coaches did not have the requisite CPR and/or basic first aid training.

The plaintiffs blamed the lack of certification and/or CPR/first aid training on the Athletic Director, who they alleged did not possess the proper skills to perform the duties of his position.  (Exhibits I & J).  Additionally, when asked why they did not approach the Branford Public Schools Administration and provide the administration with an opportunity to further investigate the matter, the plaintiffs stated that the violations had been going on for eight years and that the administration, including the superintendent and principal of the high school, were not doing their job.  (Exhibit J).  The plaintiffs also indicated that the only way to get the administration to do their job was to present the information at the Board meeting.  (Exhibit J).

It should also be noted the plaintiffs conceded that they never made complaints about the Branford coaching staff or the Branford Athletic Department prior to the February 28, 2001 Branford Board of Education meeting.  (Exhibit D, pp. 35, 183-185; Exhibit E, pp. 16-17).  In fact, Chet Santoro had not attended a Board of Education meeting prior to February 28, 2001; (Exhibit D, p. 35); and Patricia Santoro had only attended one Board of Education meeting prior to that time.  (Exhibit E, pp. 14-16).  Therefore, the plaintiffs had no prior personal experience upon which to base their claim that the superintendent or the principal would not have addressed the problem unless they presented it to the Board of Education.

The plaintiffs continued to voice their opinion regarding the certification of Branford coaches and the reasons why they presented the issue directly to the Board of Education in the March 8, 2001 article in *The Sound*.  (Exhibit N).  Specifically, Chet Santoro stated that

> ***The reason we didn't go to the superintendent and the administration is because they caused the problem in the first place by hiring these***

21

*men* . . . They're the judge, the jury, and the officer. Who can you complain to? ***I know they were ambushed, but it's [the] only way they'll do anything***. The principal and superintendent would tell us they are certified.

(Emphasis added.) (Exhibit N).

Catherine Jackson, chairperson of the Branford Board of Education, instructed Dr. Storm to investigate the certification of coaches after the plaintiff's presentation on February 28, 2001. (Exhibit E, pp. 46-47). Dr. Storm conducted an investigation that revealed that the October 6, 1999 batch conversion had not been acted upon by the State Department of Education and, therefore, five-year renewable coaching permits had never been issued to the Branford Public Schools coaches. (Exhibits A & B). The batch conversion form was subsequently resubmitted and most of the coaches received their permits, except for a few who were finalizing necessary paperwork with the State Department of Education. (Exhibits A & B). Dr. Storm also discovered that the "American Red Cross" document submitted as part of the plaintiff's evidence in support of their contention that the Branford coaches were not trained in CPR and/or basic First Aid was not an official document of the American Red Cross although it had arguably been presented as an official document. (Exhibit A; Exhibit D, p. 62; Exhibit E, p. 42).

Dr. Storm reported these findings in his March 21, 2001 memorandum to the Board of Education and he also commented on what he believed to be "harsh criticism" and character assassination of the Branford Public Schools administration and the Athletic Directors. In light of the allegations that were made against him and his administration publicly without any warning, it was objectively reasonable for him to respond to those allegations in the manner that he did. In fact, he was specifically called upon to investigate the matter and report back to the Board with respect to his findings.

The undisputed facts demonstrate that the defendant's actions were objectively reasonable and, therefore, the plaintiffs' claims in Count Two of their complaint are barred by the doctrine of qualified immunity.

**B.** **PLAINTIFFS' STATE LAW TORT CLAIMS FOR DEFAMATION *PER SE* AND DEFAMATION FAIL AS A MATTER OF LAW TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

In Count One of their Complaint, the plaintiffs allege that statements attributed to Dr. Storm in the March 8, 2001 newspaper article and his March 21, 2001 memorandum to the Board constitute defamation *per se*. Specifically, the plaintiffs allege that Dr. Storm's statements that the plaintiffs had produced "fake and fraudulent documents" at the February 28, 2001 Board of Education meeting constitutes defamation *per se*. The plaintiffs incorporate the same allegations into Count Three of their Complaint, which alleges a cause of action for defamation.

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . . . " QSP, Inc v. Aetna Casualty & Surety Co., 256 Conn. 343, 356 (2001).

> To establish a *prima facie* case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result.

Cwelinsky v. Mobil Chemical Company, 267 Conn. 210, 217 (2004); *See also* QSP, Inc v. Aetna Casualty & Surety Co., 256 Conn. at 356.

"While all libel was once actionable without proof of special damages, a distinction arose between libel per se and libel per quod. . . . A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts

known by the recipient of the communication. . . ."  DeMorais v. Wisniowksi, 81 Conn. App. 595, 603 (2004).

"Libel per se, on the other hand, is a libel the defamatory meaning of which is apparent on the face of the statement and is actionable without proof of actual damages. . . .  The distinction between libel per se and libel per quod is important because [a party] may recover general damages where the defamation in question constitutes libel per se."  DeMorais v. Wisniowksi, 81 Conn. App. at 603-604.  *See also* Lega Siciliana Social Club v. St. Germaine, 77 Conn. App. 846, 852, cert. denied, 267 Conn. 901 (2003).  "In short, when a plaintiff brings an action in libel *per quod*, he must plead and prove actual damages in order to recover."  DeMorais v. Wisniowksi, 81 Conn. App. at 604.

### 1.    Libel *Per Se*

"When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation.  He is required neither to plead nor to prove it."  Lega Siciliana Social Club, 77 Conn. App. at 852.

> Two of the general classes of libel, which it is generally recognized are actionable per se, are (1) libels charging crimes and (2) libels which injure a man in his profession and calling. . . .  To fall within the category of libels that are actionable per se because they charge a crime, the libel must be one which charges crime that involves moral turpitude or to which an infamous penalty is attached.

(Internal quotation marks omitted.)  Lega Siciliana Social Club, 77 Conn. App. at 853. "Moral turpitude . . . involves an act of inherent baseness, vileness or depravity in the private and social duties which man does to his fellow man or to society in general, contrary to the accepted rule of right and duty between a person and the law."  DeVito v. Schwartz, 66 Conn. App., 228, 231 (2001).

"Whether a publication is libelous per se is a question for the court."  Lega Siciliana Social Club, 77 Conn. App. at 852.  See also Proto v. Bridgeport Herald Corporation, 136 Conn. 557, 565 (1950).  "Likewise, if the alleged defamatory words could not reasonably be considered defamatory in any sense, the matter becomes an issue of law for the Court."  Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 612, 116 A.2d 440 (1955).  See also Burns v. Telegram Publishing Co., 89 Conn. 549, 552, 94 A. 917 (1915).

The plaintiffs allege that the statements Dr. Storm made to The Sound and in his March 21, 2001 memorandum to the Board of Education concerning the "potentially fake and fraudulent documents" constitute libel per se.  The plaintiffs, however, concede that the "American Red Cross" document created by Kevin Finucane and produced to the Board of Education on February 28, 2001, was not an official document from the American Red Cross.  (Exhibit D, pp. 7, 60-62, 117-118, 122-23; Exhibit E, pp. 30, 42-44, 56-58; Exhibit H).

Moreover, Patricia Santoro admitted that someone else "manufactured" the "American Red Cross" document that she presented to the Board of Education on February 28, 2001.  (Exhibit E, p. 58).  Furthermore, in the March 8, 2001 article, Chet Santoro stated that he understood the mix up with the letterhead of the Red Cross and admitted that a friend typed the information that the Red Cross provided to them.  (Exhibit N).  Additionally, Chet Santoro conceded that the "American Red Cross" document presented to the Board of Education, did not indicate that the information contained in the documents was obtained from the American Red Cross or that the document **was not prepared** by the American Red Cross.  (Exhibit D, p. 120).  Furthermore, Chet Santoro conceded that it would have been better to present the actual letter that Patricia Santoro had written to Elizabeth Hernandez with the handwritten responses in the margins to the Board of Education.  (Exhibit D, p. 121-122).

A comparison of the "American Red Cross" document created by Kevin Finucane and the letter from Patricia Santoro with the handwritten information regarding CPR/First Aid certification demonstrates that the document presented to the Board of Education was not entirely consistent with the handwritten responses to Patricia Santoro's letter. (Exhibits G & H). In fact, the American Red Cross did not have any records for many individuals, yet the "manufactured" document indicated that some of those same individuals were not certified. (Exhibits G & H). Also, some of the individuals were not even listed in Patricia Santoro's letter, yet their names still appeared in the "manufactured" document. (Exhibits G & H).

### a.    *Truth is an Absolute Defense*

There is no dispute that the plaintiffs **failed** to provide the Board of Education with a copy of the letter from Patricia Santoro with handwritten responses from the American Red Cross. Therefore, the only information with which the Board of Education and Dr. Storm were provided failed to show that the plaintiffs had actually obtained information from the American Red Cross. Thus, it was reasonable for Dr. Storm to conclude that the document was "fake and/or fraudulent," after Mr. Sunny told him he did not recognize the document and that it was not official American Red Cross letterhead.

"In a civil action for libel, where the protected interest is personal reputation, the rule in Connecticut is that the **truth** of an allegedly libelous statement of fact provides an absolute defense." Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 113, 448 A.2d 1317 (1982). "Contrary to the common law rule that required the defendant to establish the literal truth of the precise statement made, the modern rule is that only substantial truth need be shown to constitute the justification." Id.

26

The undisputed facts demonstrate that the "American Red Cross" document produced at the February 28, 2001 Board meeting was not an official document and that it was "manufactured;" therefore, the statement attributed to Dr. Storm in the March 8, 2001 article in *The Sound* is a true statement.  Dr. Storm's statement in his March 21, 2001 memorandum to the Branford Board of Education that the "[i]nformation shared with this Board at the February 28th meeting in the manila folders distributed by the 'concerned citizens' contained *potentially fake and fraudulent documents disguised as New Haven Red Cross stationary,*" is also a true statement because the plaintiffs concede that the document was not on American Red Cross letterhead, that it was created by Kevin Finucane and that it was not an official document of the American Red Cross.

Therefore, the plaintiffs' claim that the aforementioned statements constitute libel *per se* fails as a matter of law and the defendant is entitled to summary judgment with respect to Count One of the plaintiffs' complaint.

> ### b.    Statements That Fail to Identify the Plaintiffs to a Third Person are Not Actionable

The plaintiffs also claim that the defendant accused them of engaging in fraudulent acts of deception to obtain documents regarding the certification of Branford Public Schools coaching staff.  (Complaint, Count One, ¶ 11).  It should be noted that none of the documents that allegedly contain defamatory statements indicate that the plaintiffs participated in acts of "fraudulent deception."  That being said, the plaintiffs presumably are referring to the statement in the March 8, 2001 article in which Dr. Storm allegedly stated that someone had misrepresented himself as a member of the Board of Education.  (Exhibit N).

An essential element of a *prima facie* claim for defamation is that the defendant identifies the plaintiff to a third person.  *See* Cwelinsky v. Mobil Chemical Company, 267 Conn. at 217.  In the present case, Dr. Storm did not identify the person who allegedly misrepresented himself to the American Red Cross as a Board of Education member. (Exhibit N.)  Accordingly, the plaintiffs' claim that Dr. Storm defamed them by accusing them of engaging in fraudulent acts of deception to procure certain documents fails as a matter of law and the defendant is entitled to summary judgment with respect to this claim.

> ### c.    The Defendant Did Not Accuse the Plaintiffs of Committing a Crime Much Less a Crime of Moral Turpitude

The defendant maintains that his statements regarding the "potentially fake and fraudulent" and "manufactured" documents produced at the February 28, 2001 Board meeting, are not defamatory because the undisputed facts demonstrate that the statements are true.  If the court were to conclude, however, that the statements made by the defendant regarding "potentially fake and fraudulent" and "manufactured" documents were not true, said statements do not charge the plaintiffs with either a crime or with a crime of *moral turpitude*.

 A statement that documents produced at a meeting were "fake and fraudulent" or that the documents were "manufactured" does not impute a crime to the plaintiffs. The defendant was reporting what he had discovered following his investigation into the certification and CPR/First Aid training of the Branford Public Schools coaching staff. Part of his investigation uncovered the fact that the plaintiffs had produced a document that was not created by the American Red Cross.

The defendant's statement to the reporter for *The Sound* and in his March 21, 2001 memorandum to the Board of Education informed the Board that the document produced on what appeared to American Red Cross letterhead was not an official

document and it was not official letterhead.  Moreover, an individual who was not affiliated with the American Red Cross created the document by the plaintiffs' own admission.

The defendant did not state that the plaintiffs had committed a crime by producing fake and/or fraudulent documents.  The defendant merely reported the facts that he had uncovered during his investigation of the matter.  Therefore, the statements do not constitute libel *per se* and the defendant is entitled to judgment as a matter of law with respect to Count One of the complaint.

## 2.    Libel *Per Quod*

In Count Three, the plaintiffs incorporate the same allegations from Count One. Additionally, the plaintiffs identified four documents as libelous in their supplemental discovery responses.  (Exhibit Y).  The defendant relies on his argument in Section III B, supra, regarding the "potentially fake and fraudulent" and "manufactured" documents to assert that these statements do not constitute defamation.

With respect to the other statements made in the March 21, 2001 memorandum and the March 26, 2001 and August 13, 2001 letter to Dr. Hilary Freedman, the defendant will not address each statement separately.  For the specific statements that the plaintiffs allege are libelous, the defendant refers the Court to the plaintiffs' supplemental discovery responses.  (Exhibit Y).   The defendant will address each document as a whole and the individual "allegedly" libelous statements as necessary.

### a.    The Undisputed Facts Demonstrate that the Defendant's Statements Are Not Defamatory

"To prevail on a common-law defamation claim, [the plaintiffs] must prove that the defendant published *false statements about [them] that caused pecuniary harm*. . . .  To be actionable, *the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion*." (Emphasis added.)  Daley v. Aetna Life & Casualty Co., 249 Conn. 766 (1999).

> A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . .  An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact.

Iosa v. Gentiva Health Services, No. 3:03CV1538 (D. Conn. 2004).  "Expressions of opinion cannot as a matter of law be defamatory."  Id.

"An assertion that cannot be proved false cannot be held libelous.  A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be."  Hotchner v. Castillo-Puche, 551 F.2d 910, 913 (2d Cir. 1977).

> Although it is clear that expressions of opinion are constitutionally protected, the determination of whether a specific statement is one of opinion or fact is difficult.  As an initial matter, the inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an ordinary reader of the statement. . . .  *It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court.*

 (Citations omitted; emphasis added.)   Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219, 224 (2d Cir. 1985).

There is an exception to the general rule that the mere expression of an opinion is not actionable.

> Liability for libel may attach . . . when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader.  If an

30

author represents that he has private first hand knowledge, which
substantiates the opinion he expresses, the expression becomes as
damaging as an assertion of fact.

Mr. Chow of New York, 759 F.2d at 225.

In determining whether a statement is one of opinion or one of fact:

[the court] must examine both the context in which the statements are
made and the circumstances surrounding the statements . . .  [The court]
must also look at the language itself to determine if it is used in a precise,
literal manner or in a loose, figurative or hyperbolic sense. . .  Related to
this inquiry, [the court] must examine the statements to determine whether
they are objectively capable of being proved true or false. . .   Finally, if the
above analysis indicates that the statement is opinion, [the court] must
determine if it implies the allegation of undisclosed defamatory facts as the
basis for opinion.

Mr. Chow of New York, 759 F.2d at 226.

The District Court of Connecticut followed a similar test in Johnson v. Schmitz,

119 F.Supp.2d 90, 101 (D.Conn. 2000).  In Johnson v. Schmitz, the plaintiff sued the

defendants for defamation because they had allegedly made false statements that

injured him.  Id.  Specifically, the plaintiff alleged that the defendants stated that "he

could not see the 'big picture,' that his thinking was flawed, and his idea ridiculous and

unoriginal." Id.  Additionally, the defendants allegedly stated that the plaintiff "did not

have what it took to write a thesis and be awarded a Ph. D."  Id.

After considering the context and circumstances in which the allegedly

defamatory statements were made, the language used and whether the statements

were objectively capable of being proved true or false, the court concluded that the

defendants' statement were merely expressions of opinion.  Johnson, 119 F.Supp.2d at

101-102.  The court reasoned "the statements were made during an academic

evaluation of the plaintiff's work and that an ordinary person would be likely to understand the comments as an expression of the speaker's opinion." Id., at 102.

In Colon v. Town of West Hartford, the plaintiff sued the Town of West Hartford, numerous members of the police department, the West Hartford News, its editor and one of its reporters for defamation. Colon, No. 3:00CV168, slip op, at 1 (D. Conn. 2001) (copy attached). An alleged defamatory article was published by the police chief's wife, in which she described the plaintiff's actions in consoling a victim of a flasher. Id., at 2. Apparently, the plaintiff used the term "woody" and stated that the victim must have excited the man. Id. The author of the article stated that the plaintiff didn't think he should have gotten in trouble for making such a comment and that the plaintiff filed a CHRO complaint because "he thinks he had been punished for actions based on the fact that he is Hispanic." Id.

The plaintiff asserted that these statements conveyed "an inaccurate, false and malicious portrayal of him and [rendered] the article defamatory." Colon, No. 3:00CV168, slip op, at 4. After considering the article in its entirety and the context in which it was published, the court concluded " as matter of law that the writer was making a statement of opinion, not fact, and as such, the article enjoys an absolute privilege." Id. The court also noted that the

> article expressly states that the writer is commenting on and taking a stand on the actions and conduct of an unnamed police officer. This type of cautionary language is a strong signal to an average reader that he is reading the writer's opinion, not statements of fact. Moreover, there is nothing in the tenor of the language used that would cause the average reader to believe that the remarks were going beyond opinion into the realm of fact. ***An author is constitutionally permitted to use exaggeration, hyperbole, ridicule, sarcasm, stylistic touches, and figurative expressions to embellish disclosed facts.***

(Emphasis added.)  Id., at 5.

The court noted that "[a] reasonable person could only view the article as a personal comment of the author's opinion and as such, it is unqualifiedly protected by the First Amendment."  Colon, No. 3:00CV168, slip op, at 6.  The court also reasoned that "none of the three challenged statements can, when read in the entire context of the article, be reasonably understood as implying the existence of undisclosed facts." Id.

In the present case, after examining the alleged defamatory statements in the context of the entire communication, the circumstances in which the statements were spoken or written, the only logical conclusion is that the defendant's comments are merely expressions of opinion.  The circumstances of the present case are particularly helpful in demonstrating that the statements made by the defendant are opinion rather than objectively verifiable statements of fact.

It is undisputed that the plaintiffs presented information to the Board of Education regarding the certification and CPR/First Aid training of the Branford Public Schools coaches.  During that presentation, Ms. Santoro informed the Board of Education "if we had a full time Athletic Director in this position with the proper skills, this probably would not have happened."  (Exhibits I & J).  John Prins, a member of the Branford Board of Education, interrupted Ms. Santoro and asked her if she had given the administration an opportunity to review the information and address it.  (Exhibit J).  Ms. Santoro responded that she had not presented the information to the administration because it had been going on for eight years.  (Exhibit J).

33

Chet Santoro also spoke at the February 28, 2001 Board meeting.  (Exhibit J).

Mr. Santoro stated that the Board of Education and the administration was "breaking a

couple of laws" and that the issue had to be addressed right now.  (Exhibit J).  Mr.

Santoro stated that "if the administration did their job, this wouldn't be an issue," and

that they had to come forward with this information to make them do their job.  (Exhibit

J).  Mr. Santoro further stated, "if the superintendent and principal did their job we

wouldn't be here today."  (Exhibit J).  In the March 8, 2001 article, Mr. Santoro stated

> ***The reason we didn't go to the superintendent and the administration
> is because they caused the problem in the first place by hiring these
> men*** . . .  They're the judge, the jury, and the officer.  Who can you
> complain to?  ***I know they were ambushed, but it's [the] only way
> they'll do anything***.  The principal and superintendent would tell us they
> are certified.

(Emphasis added.)  (Exhibit N).

In the same article, the Chairperson of the Board of Education noted that the

Santoros did not follow the "normal procedures" for reporting concerns to the

administration or the Board.  (Exhibit N).  "Normally, a person would say something to

the athletic directors or to the superintendent first.  Dr. Storm . . . has been looking into

it, and I've gotten several calls about what [Santoros] motivation is."  (Exhibit N).  It is

against this backdrop that Dr. Storm conducted his investigation into the certification of

the Branford Athletic Directors and coaches.

Dr. Storm prefaced many of the *"alleged"* defamatory statements in his March 21,

2001 memorandum to the Board with the following cautionary language:  "I think," "it is

my expectation," and "I believe;" thereby indicating to the average reader that these

statements were Dr. Storm's opinion rather than an objectively verifiable assertion of

fact.  Dr. Storm's statement that the plaintiffs' criticisms were "harsh", that the plaintiffs

were participating in "character assassination" and that their presentation was an "attack," is his opinion in response to a presentation in which the plaintiffs accused not only the Athletic Directors of lacking the requisite skills for their positions, but also accused the defendant and other members of the administration of not doing their job. Therefore, it is not surprising that Dr. Storm felt that the presentation was an "attack" or that the "criticisms were harsh."

Dr. Storm also commented that the plaintiffs' criticisms were "largely inaccurate" and "vastly distorted." His investigation of the matter revealed that some of the information was not entirely accurate and that there was actually an explanation for what happened with the coaching permits for the Branford Public Schools coaching staff. As is evident from their presentation, the plaintiffs never considered the possibility that the batch conversion form had actually been sent but not processed by the State Department of Education. Rather the plaintiffs jumped to the conclusion that if the Athletic Directors had the proper skills to perform their job this would have never happened. (Exhibits I & J). Furthermore, they accused the administration of covering up the fact that the Branford coaching staff was not certified, implying that the administration knew all along that the Branford coaches were not certified. (Exhibits I & J).

Dr. Storm's statements that the plaintiffs presentation had more to do with "causing personal harm and embarrassment" than protecting the Town from liability and that the plaintiffs' motives were "highly suspect" is an expression of Dr. Storm's opinion with respect to the plaintiffs' motives. The undisputed facts demonstrate that these expressions of opinion are based at least in part upon disclosed facts. For example,

Catherine Jackson indicated in the March 8, 2001 article that she received several phone calls regarding the plaintiffs' motives. (Exhibit N).  Furthermore, the plaintiffs admit that they had no interest in the certification of the Branford Athletic Directors or coaches prior to their son being cut from the basketball team.  (Exhibit D, p. 35; Exhibit E, pp. 16-17).  Moreover, Chet Santoro hoped that presenting this information to the Board of Education would ultimately lead to the removal of the Branford Athletic Directors from their positions. (Exhibit D, p. 63).  Thus, despite the plaintiffs' assertions to the contrary, it appears that they had other motives besides protecting the Town of Branford from liability and protecting the children in the Branford Public Schools from harm.

The same analysis applies to the statements in Dr. Storm's letters to Dr. Freedman.  The statement that the plaintiffs are "mean spirited" is Dr. Storm's opinion and not objectively verifiable.  Based on the fact that the plaintiffs failed to contact the Board of Education or the administration prior to making the information with respect to certification public, Dr. Storm believed that the plaintiffs were "mean spirited."  The fact that the plaintiffs disagree with this opinion or that they believe they are not "mean spirited" does not render the statement false; rather, it serves to demonstrate that people will have differences of opinion with respect to certain behavior.  Dr. Storm is entitled to express his opinion particularly when members of his administration and coaching staff are accused of not doing their job or of lacking the requisite skills to perform their job duties.

Similarly, Dr. Storm's statement in the August 13, 2001 letter to Dr. Freedman that the plaintiffs assaulted the Branford Athletic Directors' "livelihood and integrity" is

his opinion.   Even assuming it is a statement of fact rather than an opinion, this statement is arguably true.  Chet Santoro admitted that he hoped that the Board of Education would remove the Athletic Directors from their position after presenting this information.  (Exhibit D, p. 63).  Additionally, in her presentation to the Board, Ms. Santoro attributed the problems with certification of the coaches to the Branford Athletic Director and indicated that if he had the proper skills this would not have happened. (Exhibit I & J).  These statements indicate that the plaintiffs had other motives in mind.

The defendant maintains that the alleged defamatory statements in his March 21, 2001 memorandum to the Board of Education and in his letters to Dr. Freedman were merely expressions of his opinion.  Additionally, the defendant contends that his opinions were based on facts that were discovered in his investigation of the certification of the Branford coaching staff.  Accordingly, the defendant is entitled to summary judgment with respect to Count Three of the complaint because expressions of opinion are not actionable as a matter of law.   *See, e.g.,* Colon v. Town of West Hartford, No. 3:00CV168, slip op, at 4.

### b.    *Count Two Fails as a Matter of Law Because the Plaintiffs Fail to Allege Pecuniary Harm*

Even assuming that the Court could conclude that the defendant's statements were objectively verifiable false statements of fact rather than mere expressions of opinion, the plaintiffs' claims that the defendant defamed them fail as a matter of law because the plaintiffs have failed to allege any economic loss or pecuniary harm as a result of the defendant's actions.  "To prevail on a defamation claim, the [plaintiffs] must show that the defendant published false statements about [them] that caused pecuniary harm."  Johnson v. Schmitz, 119 F.Supp.2d at 101.  *See also* Daley v. Aetna Life & Casualty Co., 249 Conn. at 795.

"Special damages consists of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." <u>Celle v. Filipino Reporter Enterprises</u>, 209 F.3d 163, 179 (2d Cir. 2000). In the present case, the plaintiffs have failed to allege any pecuniary harm.  The plaintiffs concede that they have not suffered any monetary damages as a result of the alleged defamatory statements by Dr. Storm.  (Exhibit D, p. 199; Exhibit E, p. 118).   In the absence of any economic loss or pecuniary harm resulting from the defendant's alleged defamatory remarks, the plaintiffs' defamation claim fails as a matter of law. Accordingly, the defendant is entitled to judgment as a matter of law with respect to Count Three of the complaint.

### C.      ALTERNATIVELY, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS

In addition and in the alternative, if the Court concludes that the plaintiffs have failed to state a valid federal claim or that the plaintiffs' claims are barred by the doctrine of qualified immunity, the Court should decline to exercise jurisdiction over the pendant state law claims.  See <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in the jurisdictional sense, the state claims should be dismissed as well."); <u>Lennon v. Miller</u>, 66 F.3d 416, 426 (2d Cir. 1995) (same).

**IV.**     <u>**CONCLUSION**</u>

For all of the foregoing reasons, the defendant's motion for summary should be

granted.

DEFENDANT,
BRUCE STORM


By___/s/ Melanie A. Dillon_____
    Melanie A. Dillon
    Howd & Ludorf
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    ct24786

39

## **CERTIFICATION**

  This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 1st day of June, 2004.


Katrina Engstrom, Esquire
Norman A. Pattis, Esquire
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510


            _____/s/ Melanie A. Dillon_____
            Melanie A. Dillon