Exhibit P

**Branford Public Schools
Office of the Superintendent**

# Memo

*Document #17*

**To:**   Catherine Jackson, Chairperson, Branford Board of Education

Members, Board of Education

**From:**  Bruce E. Storm, Ed.D., Superintendent of Schools

**C:**   M. Winzler; E. Higgins, S. Synodi; J. Palluzzi; File

**Date:**  March 21, 2001

**Re:**   Report on Coaching Certification & Related Issues

---

A. <u>INTRODUCTION</u>

At the February 28th Board of Education meeting, during the "Audience of Citizens," two ""concerned citizens"" distributed materials in a manila folder and proceeded to speak at length regarding the function of our Co-Athletic Directors (John Palluzzi and Savas Synodi), and their certification; they also talked extensively about information they had gathered from a variety of sources regarding the certification of many Branford coaches. Their criticisms were harsh and, as has subsequently been shown, largely inaccurate. Their announcement of their "findings" was the first indication that any of the administration had of their concerns, concerns they contended were "related to their interest in protecting the school district from any liability."

The purpose of this report is to relay to the Board a number of facts pertaining to the follow-up on the accusations made on the 28th and provides a thorough compilation of data regarding our coaching staff and our Athletic Directors. I also will spend time at the conclusion of this document discussing what I think to be a very serious matter of individuals participating in unrestricted and unfounded attempts at character assassination, before the camera, without limit. I believe we have all learned from this experience in various ways. I am reassured by the Board beginning a dialogue regarding appropriate and inappropriate public participation and what restrictions can and should be in place when a personal agenda seeks to stigmatize an employee unfairly, for clearly selfish reasons.

B. <u>BACKGROUND</u>

In order to give a thorough explanation for why the ""concerned citizens"" who spoke two weeks ago possessed information that suggested that several of our coaches were not certified, I must provide some historical detail that clears up why the data provided by the state to the ""concerned citizens"" was inaccurate.

In July of 1999, the State Department of Education took it upon itself to adjust the coaching credentialing process, and informed Boards of Education across the state of these planned changes. Key among the alterations was the provision of a five-year renewable coaching permit,

with various stipulations regarding annual renewals in the area of CPR and the necessity of requiring in-service training during the duration of the five-year permit. Branford, like all districts in the state, received a document which was referred to as a "batch conversion" form allowing all of our coaching staff to shift to five-year permits at one time. It was required that every member of the coaching staff be listed, along with whether or not they had teaching or coaching credentials, as well as photocopies of the backs and fronts of their first aid and CPR cards. Since athletic staff is off during the summer break, the process got underway at the beginning of school in September and by October of 1999, the "batch conversion" form for the five-year permits was completed and signed by me on October 6, 1999. At that juncture, the form was forwarded to the State Department of Education with the expectation that our coaching staff would receive their five-year permits as per the new guidelines. At a point in time following the submission, our Athletic Directors contacted the State Department and inquired about the status of the conversion and when the coaching permits would be sent. They were told at that time that those permits would be sent to the district office in the following weeks. The permits were never provided to the Central Office and the Athletic Directors continued to operate on the assumption that the permits had been sent here and placed in the personnel files of the coaches.

It is interesting to note that unlike teacher and administrative certification, coaching permits and the certification process is not audited at the state level. Hence, there was no notification that there had been an error in authorizing the "batch conversion" of our coaches and until the ""concerned citizens"" made their contact, no notification had been received for nearly one and one-half years since that form was submitted. I think the state bears some burden for never having informed us of the failure on their part to process our "batch conversion" sheets or to alert us to their apparent loss. As a result of the personal quest of the ""concerned citizens"", under FOI, we began to learn that there had been a serious gap in the communication of information about our coaches and the return of that information pertaining to the coaching permits. If anything positive can be found in this experience, it is that ultimately we have been able to clear up some confusion and to improve our communications with the Bureau of Certification and internally, as well.

On the day following the February 28th Board meeting, Mr. Winzler and I joined with Dr. Higgins, Mr. Synodi, Mr. Palluzzi, at which time we reviewed everything in the Athletic Directors' files including information that should never have come into the hands of ""concerned citizens"." (To this day, we continue to be somewhat concerned about how certain proprietary documents were acquired by them.)

At the meeting, Mr. Synodi produced copies of the "batch conversion" sheets containing the names of all of our coaching staff as of September, 1999. Attached to the sheets were photostatic copies of the first aid and CPR cards for all of the applications. My signature appears at the bottom of the sheets. At that juncture, Mr. Winzler contacted Hilary Freedman at the Bureau of Certification to begin an extensive investigation into the whereabouts of our "batch conversion" sheets and the very real concern we had that our coaching staff was in "limbo" for the present time due to the failure on the State's part to forward the appropriate coaching permits to us.

I think it is important to emphasize that while the individuals listed on the sheets provided by the ""concerned citizens"," appeared, from the state's perspective, to lack certification, all training was in order and students were not at risk in any way as implied by the ""concerned citizens"" in their presentation on the 28th. It is important to add that both Mr. Palluzzi and Mr. Synodi are certified first aid and CPR instructors, and make certain that coaching staff, and the physical education department, have frequent upgrades during the course of the year.

Since that evening, Mr. Winzler and the Athletic Directors have worked tirelessly to ensure that the missing certifications are restored and all things are in proper order.

C.  **CURRENT STATUS OF COACHING CERTIFICATION**

Having spoken to a number of Board members, I am very aware that you are concerned that this situation be handled appropriately. Allow me to assure you that of our total coaching staff, consisting of more than 40 individuals, are all either fully certified or finalizing necessary paperwork with the State Department of Education. Two of our coaches are required to locate transcripts and diplomas from earlier education that is posing some difficulty for them to track down. Suffice it to say that all individuals working with our student athletes in the current season have appropriate certification, first aid and CPR training, and are authorized to conduct practices and to compete on an interscholastic basis. They are also authorized and permitted to use a variety of volunteers under their auspices during their seasons.

The lists included in the manila folders provided by the ""concerned citizens"" at the February 28th meeting included the names of several individuals who have no formal relationship with our coaching program. Included among those names were parents who are simply associated with the program as bystanders and occasional helpers, as well as individuals who have volunteered their services over the years and, as such, require no special certification as long as they are under the direct supervision of a certified coach. We continue to be mystified by the source of several of those names, and have concluded that the ""concerned citizens"" obtained them from a "confederate" whom I will mention later in this report. I would also like to assure the Board that any individual, for one reason or another, who experiences difficulty in completing necessary steps, and has experienced this difficulty through no fault of their own, I will authorize an emergency certification as long as their first aid and CPR are in order for the current season. While I am not anticipating having to do that in any of the cases before me, I am certainly willing to do that to ensure that all coaches are appropriately authorized.

Let me emphasize again, all coaches on our staff are appropriately certified and a few are in the final stages of processing necessary paperwork. I am confident that these individuals were appropriately certified when this issue was raised by "concerned citizens". It is my expectation that this situation was vastly distorted and I am comfortable that the Board of Education was never at risk from any form of liability as a consequence of the equally shared burden of error on the part of the State Department of Education, our Athletic Department, and our Central Office.

D.  **RESPONSIBILITIES OF THE ATHLETIC DIRECTORS**

As part of the broad-brush approach that was used in their attack on February 28th, the ""concerned citizens"" also raised questions about the certification of our Co-Athletic Directors. Our Co-Athletic Directors possess the necessary certification to run the program that they do, to teach and coach students, and to supervise and observe members of our coaching staff. They do not possess the necessary 092 to evaluate our coaches, but have provided their information as on-field observers to our administrators at the high school and all evaluations have been conducted under the auspices of 092 certified administrators. Their role is not unlike that of our academic department leaders who supervise teachers in their subject areas and provide support to our administrators in the evaluation process. Further, their oversight of our 9-12 athletic program does not require administrative certification.

In point of fact, we have the best of all possible worlds with this arrangement. We have skilled coaches observing and meeting with coaches on a regular basis, all culminating in a summative assessment which is discussed with and approved by certified administrators. We believe this is a very good arrangement and one that falls within the boundaries of the law.

E.  **REACTION/CONCLUSIONS**

At this point, I would like to conclude with a few personal comments about what this affair has caused. First, speaking on a personal level, I found the offensive and professionally demeaning comment in the press, attributed to one of our ""concerned citizens"" the situation if it was brought

to my attention that I would simply "cover it up." This is an unfounded allegation and I think clearly does deliberate harm to my reputation and the reputation of other administrators who are mentioned as having personal reasons for overlooking the issues raised. Frankly, I believe that the approach used to address these circumstances of concern reveals an interest that has more to do with causing personal harm and embarrassment to a variety of individuals and not to protect the school district from issues of liability.

Looking beyond my personal reactions and those of my administration whom I believe were wronged both in the press and in public commentary by the ""concerned citizens"," I have to also attend to the reputations of others whose names were unfairly and inappropriately associated with this attempt at public character designation. Most Board members are aware that the motives associated with this "event" are highly suspect. We can begin to unravel those motivations once we realize that there are personal animosities harbored by these individuals towards specific coaches for their treatment of their respective student athletes; we also know that there is "ill will," in general, related to the use of town- and school-owned baseball fields during the summer months; and we know for a fact that the "confederate" of the "concerned citizen" harbors deep-seated displeasure with the athletic program that has resulted in that individual's removal of his student athlete from the Branford schools on several occasions. It is important for the Board to know that this latter individual participated in this scheme to defame and demean our Athletic Department and our coaches.

Information shared with this Board at the February 28th meeting in the manila folders distributed by the ""concerned citizens"" contained fake and potentially fraudulent documents disguised as New Haven Red Cross stationery. Upon further investigation, it was learned that the Red Cross had in fact provided information to the "confederate" of the ""concerned citizens"" under the misguided presumption that this individual was a representative of the Board of Education. Upon further investigation and sharing of photographs of the "confederate", it was determined that that individual had arrived at the New Haven Red Cross on two different occasions, again representing himself as an agent of the Board of Education in an attempt to secure information that proved to be partially inaccurate in several instances. I should point out here that Red Cross and CPR training can be acquired through other avenues other than that controlled by the Red Cross of New Haven. Therefore, their database will only include those individuals trained locally. Representatives of the New Haven Red Cross have subsequently contacted me and have indicated their approval of the necessary certifications for our entire staff. They also feel that they were deceived; I feel they were deceived. And most of all, I feel that this Board was deceived in a variety of ways.

If one essential lesson has been learned, and one reason that we can all be thankful, it is that we have developed an understanding that when issues are surfaced in this fashion, that they are immediately turned over to the administration, who will pursue every allegation and every assertion aggressively and will uncover the information that is required. I sincerely hope that as an individual that further character assassination and public criticism of anyone associated with our program is called to a halt quickly and never allowed to occur in the future.

w